UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                             :

MARIA HERMINIA GRATEROL-GARRIDO,     :
                             :

                Plaintiff,     :

                             :       20 Civ. 4209 (JPC)
          -v-                :

                             :     <u>FINDINGS OF FACT AND</u>
PATRICIA MARIA VEGA,              :     <u>CONCLUSIONS OF LAW</u>
                             :

                Defendant.    :
                             :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Maria Herminia Graterol-Garrido brought this against Defendant Patricia Maria Vega, alleging that Vega made several defamatory statements about her on May 16, 2020.  Dkt. 1 ("Complaint").  In 2010, Vega had a sexual encounter with Graterol-Garrido's husband, which resulted in the birth of a child early the next year.  The allegedly defamatory statements included social media postings that accused Graterol-Garrido of misconduct related to the resulting family court proceedings, Graterol-Garrido's financial dealings, and other matters.  Vega also sent messages over Facebook to Graterol-Garrido's prospective business affiliate in Australia, conveying similar allegations.

      A two-day bench trial occurred on November 9 and 10, 2021.  *See* Dkts. 70, 72.[1]  For reasons that follow, the Court finds in favor of Graterol-Garrido as to all causes of action, concluding that Vega defamed Graterol-Garrido through various statements made on May 16, 2020, and awards judgment in the amount of $5,000.

---

[1] The transcript of the bench trial is referred to herein as "Tr." and any exhibits received as evidence at trial are referred to as "Exh."

## I.      Background

Graterol-Garrido commenced this action on June 2, 2020, pleading three claims of defamation *per se* and seeking general, special, and punitive damages, as well as a permanent injunction.[2]  Complaint ¶¶ 18-44, p. 15.  Graterol-Garrido, a Venezuelan citizen domiciled in Australia, sues under this Court's diversity jurisdiction, alleging that Vega is an American citizen domiciled in New York.  *Id.* ¶¶ 2-4; *see* 28 U.S.C. § 1332(a)(2).  Vega asserts the defenses of "[t]ruth" and "[s]elf-defense."  Dkt. 45 ("Answer") at 1.  Since the initiation of this case, Vega has litigated *pro se*, notwithstanding the Court's efforts to locate *pro bono* counsel to represent her.  *See* Dkt. 42.

The Complaint alleges that in 2014, about four years after Graterol-Garrido's husband, Peter Ikladious, had a sexual encounter with Vega, Vega reached out to Ikladious concerning the paternity of her son.  Complaint ¶ 7.  The Complaint maintains that Ikladious acknowledged paternity and began paying child support pursuant to a consent support order entered in a New York Family Court proceeding.  *Id.*  In January 2019, Vega moved to vacate that support order, arguing that additional income should be included in the order.  *Id.* ¶ 10.  Vega later withdrew that motion and filed an action in New York Supreme Court, New York County, attempting to establish parentage of her son and demanding $90 million in restitution.  *Id.*  ¶ 11.  On May 15, 2020, the Supreme Court granted Ikladious's motion to dismiss Vega's action.  *Id.* ¶ 13.

According to the Complaint, Vega published the defamatory statements on May 16, 2020, the day following that state court dismissal.  *Id.*  Three communications allegedly made by Vega

---

[2] Graterol-Garrido does not seek at this time a permanent injunction as relief following the bench trial.  Instead, she "requests permission to brief the appropriateness of granting a permanent injunction in the event the Court finds in her favor on liability."  Dkt. 69 ("Pl. Proposals") at 20 n.4.

on that date are at issue: (1) a public Facebook posting, *id.* ¶¶ 13, 18-26; (2) a direct Facebook message to the Think+Do Tank Foundation, an Australian nonprofit organization of which Vega now serves as a director, *id.* ¶¶ 14, 27-35; and (3) a public post on Twitter, *id.* ¶¶ 15, 36-44.

Graterol-Garrido identifies specific statements in these messages that she alleges were knowingly false and caused her personal and professional reputational damage. *Id.* ¶¶ 23-25, 32-34, 41-43. The Complaint also alleges that the statements were defamatory *per se* because they defamed Graterol-Garrido in her professional capacity and accused her of serious criminal wrongdoing. *Id.* ¶¶ 20, 29, 38. As discussed more fully below in the Findings of Fact, these statements accused Graterol-Garrido and Ikladious of, among other things, concealing their income, hiding and fraudulently transferring assets, and committing fraud upon the state courts, all to avoid paying child support to Vega's son. *Id.* ¶¶ 13-15.

On February 25, 2021, after the close of discovery, the Court held a status conference and set a trial-ready date of May 3, 2021. Dkts. 40, 43 ("2/25/21 Tr."). At this conference, the Court explained to Vega that the trial would concern Graterol-Garrido's allegations that Vega engaged in acts of defamation, to which Vega responded that her defense would be that any statements she made about Graterol-Garrido were truthful. 2/25/21 Tr. at 5-14; *accord* Answer ¶¶ 4a, 4b, 8. Vega also requested during the conference that the Court seek *pro bono* counsel to represent her during the trial. 2/25/2021 Tr. at 20-21. On March 1, 2021, the Court granted that request and directed the Clerk's Office to attempt to locate a volunteer attorney to represent Vega. Dkt. 42. On March 3, 2021, the Court held another status conference, at which the Court directed the parties to exchange lists of trial witnesses, along with a summary of the anticipated testimony of each witness, by March 19, 2021. Dkt. 52 at 18-19.

On April 2, 2021, Graterol-Garrido filed her Pretrial Statement and Proposed Findings of Fact and Conclusions of Law, a witness list, and a motion *in limine*, which primarily sought to exclude certain witnesses that Vega intended to call at trial.  Dkts. 46-49.  On April 20, 2021, the Court granted Graterol-Garrido's motion *in limine*.  Dkt. 50.

At an April 21, 2021 status conference, the Court adjourned the May 3, 2021 trial date *sine die*, and instead set another status conference for May 3.  Dkt. 79 at 8:10-15, 20:18-25.  The Court also explained that it had thus far been unable to locate *pro bono* counsel for Vega.  *Id.* at 5:18-23.  At the May 3, 2021 conference, the Court explained that it had still not located *pro bono* counsel for Vega.  Dkt. 83 at 9:4-12, 14:12-22.  Vega also confirmed at the conference that she consented to testimony at the bench trial occurring by video.  *Id.* at 9:23-10:11.  The Court scheduled another status conference for June 30, 2021.  *Id.* at 11:3-6.  At the June 30, 2021 conference, the Court set a trial date of November 8, 2021, with a final pretrial conference for October 27, 2021, and explained that the efforts to obtain *pro bono* counsel for Vega had not been successful.  Dkt. 81 at 4:5-9, 8:4-14.  At the final pretrial conference, Vega again consented for Graterol-Garrido to testify by video.  Dkt. 85 at 7:19-24.  On October 27, 2021, the Court issued an order on the logistics for that remote testimony.  Dkt. 60.

The bench trial began on November 8, 2021 and lasted two days.  Dkts. 70, 72.  Only the two parties testified.  *Id.* Graterol-Garrido, who was located in Australia, testified by Microsoft Teams, and Vega testified in person.  Tr. at 2:3-7, 168:1-4.  Vega and Graterol-Garrido filed proposed findings of fact and conclusions of law on December 10, 2021 and December 17, 2021, respectively.  Dkt. 66 ("Deft. Proposals"); Pl. Proposals.

## II.     Findings of Fact

"In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "As with any civil case, the plaintiff bears the burden of proving the elements of [the plaintiff's] claim by a preponderance of the evidence. . . .  [I]t is within the province of the district court as the trier of fact to decide [which] testimony should be credited."  *Wilson v. Calderon*, 367 F. Supp. 3d 192, 195-96 (S.D.N.Y. 2019) (internal quotations and citations omitted).

### A.     The Parties

Graterol-Garrido studied law in Venezuela before obtaining graduate degrees from Harvard University and Columbia Law School.  Tr. at 25:20-25, 31:19-32:5.  She has specialized in women's rights advocacy since 1995, has done extensive work with the United Nations including as a consultant, and has served on boards of directors for various nonprofit institutions. *Id.* at 30:21-31:9, 32:11-21, 33:7-18.  Graterol-Garrido married Ikladious in 2005, and they have two daughters together.  *Id.* at 26:21-22, 27:15-16, 39:15-17, 40:14-15.  Graterol-Garrido and their children now live in Australia.  *Id*. at 25:13-14, 48:17-20.

Vega received a B.A. from California State University and an M.B.A. from Columbia Business School.  *Id.* at 282:14-18.  Between college and business school, Vega worked for in the hotel industry on compliance matters and at two large law firms.  *Id.* at 282:19-283:2, 283:14-21. Vega met Ikladious at Columbia Business School.  *Id.* at 44:25-45:5.  Vega later gave birth to a male child and, in June 2018, Ikladious revealed to Graterol-Garrido that he was the child's father. *Id.* at 38:16-39:8.

Ikladious had been paying child support to Vega for some time before telling Graterol-Garrido about the child.  *Id.* at 50:11-21.  Ikladious and Vega had entered into to a child support agreement, and Vega was represented by counsel during the negotiation of that agreement.  *Id.* at

255:5-266:4.  Graterol-Garrido never had a role in those child support proceedings.  *Id.* at 67:18-20.  While Ikladious continues to pay Vega child support, she does not believe that the payments are legally sufficient.  *Id.* at 276:23-277:6.

Vega lacks formal legal training and is not an expert on family law.  *Id.* at 282:1-13.  From her professional career in the legal industry, however, Vega understood the importance of obtaining legal advice; she testified that "wing[ing] it on your own," as opposed to "relying on lawyers who actually knew about the law," was "absolutely irresponsible."  *Id.* at 283:8-13.  While Vega was not "in close contact with friends who are lawyers," she was friends with a mediator who specializes in international family disputes and with lawyers at the law firms where she previously worked.  *Id.* at 285:11-286:4.  Vega also had a friend practicing law at another large law firm, who had helped her with family law matters.  *Id.* at 286:13-287:4.

Approximately eight months after learning of her husband's infidelity, Graterol-Garrido and her children moved to Australia.  *Id.* at 49:4-8.  While the family had been planning to move to Australia and had taken steps to prepare for the move, the paternity disclosure accelerated their travel plans.  *Id.* at 49:8-20.  Ikladious and his children with Graterol-Garrido are Australian citizens, and Graterol-Garrido is an Australian permanent resident; Graterol-Garrido considers Australia their "second home."  *Id.* at 48:17-20.

## B.  Background to Vega's Statements

The statements at issue in this action concern a variety of underlying topics and incidents. The Court's findings as to those background matters follow.

### 1.  Family Law Disputes

After learning of the boy's paternity, Graterol-Garrido resisted Vega's efforts to contact her and her daughters and to arrange a meeting of their children.  *Id.* at 40:12-17, 41:1-17. Graterol-

Garrido explained that the paternity revelation created "a very charged situation" for her family due to the resulting "loss of trust," so she preferred to "deal with the internal issues" within her family without Vega's involvement.  *Id.* at 90:10-25.  Graterol-Garrido also considered Vega to not be "in a position to be a good mediator" between the children due to her "ultimatums," "pressure," "aggress[ion]," and "defam[ation]."  *Id.* at 131:7-17.  Vega contacted at least one of Graterol-Garrido's friends in an attempt to locate Graterol-Garrido, *id.* at 128:7-130:11, and attempted to arrange a meeting between the children through Ikladious without Graterol-Garrido present, *id.* at 133:4-23.

On July 16, 2018, Graterol-Garrido sent Vega an email requesting that Vega cease communicating with her daughters.  Exh. 62.  Graterol-Garrido obtained a "temporary noncontact order or order of protection" due to "fears" that "Vega would approach [her and her children] or [Ikladious] in the street."  Tr. at 47:11-21.

Graterol-Garrido has never presented evidence of any kind in a family court proceeding. *Id.* at 268:8-19.  While Graterol-Garrido has been quoted in family court proceedings, she credibly testified that she never falsely accused Vega of misconduct in court, *id.* at 47:10-48:1, and Vega submitted no evidence otherwise.  Graterol-Garrido also credibly testified that she considers Vega to have engaged in "harassment and bad faith" with "a tone of communication that's almost violent."  *Id.* at 47:24-48:1.  Vega denied threatening Graterol-Garrido or her children.  *Id.* at 194:3-9.

Ikladious retained a lawyer, Randi Karmel, Esq., to represent him in family court proceedings.  *Id.* at 52:18-19.  Vega had an acrimonious relationship with Karmel.  *Id.* at 52:21-22.

## 2.  The House of Language Acquisition

Graterol-Garrido previously served as the co-founder and executive director of the House of Language Acquisition ("HOLA"), a now-defunct daycare in New York that specialized in multilingual education. *Id.* at 33:22-35:12. HOLA was duly registered as a 501(c)(3) nonprofit. *Id.* at 62:14-64:20. Graterol-Garrido was never paid by HOLA, and sometimes used her personal funds to purchase items for the organization, including by using Venmo. *Id.* at 61:19-20, 80:22-81:11, 149:16-22. Graterol-Garrido credibly testified that during her time there, HOLA paid the applicable minimum wage to its employees, did not encounter problems with the Department of Labor, and never faced allegations that it mistreated its workers. *Id.* at 64:21-23, 79:25-80:21. While HOLA had some unpaid workers, they were student teachers or interns who received class credit. *Id.* at 171:22-173:1. Graterol-Garrido also credibly testified that HOLA did not employ workers who lacked authorization to work in the United States, and there was no evidence to suggest otherwise. *Id.* at 149:23-150:10, 175:12-176:7.

## 3.  Graterol-Garrido's Inheritance

In 2010, Graterol-Garrido's father passed away, and she was the sole heir to his estate. *Id.* at 36:19-38:3. As part of resolving the estate, Graterol-Garrido sold her father's properties in Florida. *Id.* at 36:19-37:15. When doing so, some documents showed that the properties were transferred for a fictional price of $10 and other consideration, a standard practice in real estate transactions. *Id.* at 53:24-54:10, 58:25-59:7. Graterol-Garrido ensured that all taxes resulting from the disposal of the estate were paid. *Id.* at 54:24-55:7; *see also id.* at 125:17-19, 127:11-13 (Graterol-Garrido testifying that she engaged tax advisors to ensure compliance with tax laws). No evidence was presented to suggest that unpaid taxes were owed. Some of Graterol-Garrido's friends from HOLA witnessed and notarized documents related to Graterol-Garrido's interests in

Florida. *Id.* at 53:13-23, 157:4-12, 158:22-159:1. At the time that Graterol-Garrido began selling the properties, she did not know that her husband had a child with Vega. *Id.* at 36:17-38:3, 54:11-23.

### 4.  Graterol-Garrido and Ikladious Separate Their Assets

Graterol-Garrido and Ikladious eventually separated their assets; Graterol-Garrido testified that the reasons for the separation included ensuring that Ikladious did not spend her money on child support and clarifying estate planning. *Id.* at 50:3-10, 110:8-13, 145:15-146:3.

Graterol-Garrido and Ikladious had purchased an apartment in the Upper West Side of Manhattan in their individual capacities with the proceeds of Graterol-Garrido's father's estate. *Id.* at 45:23-25, 95:14-96:17, 112:8-18. After their marriage became troubled, the apartment was transferred to Graterol-Garrido pursuant to a postnuptial agreement. *Id.* at 109:14-110:7. The transfer was from an LLC, not from Graterol-Garrido and Ikladious individually; Graterol-Garrido and Ikladious used an attorney to arrange the necessary transactions. *Id.* at 96:23-97:11, 108:17-109:11. Graterol-Garrido and Ikladious's attorney, who notarized some of the documents, neglected to notarize certain pages in them. *Id.* at 99:7-100:13. Graterol-Garrido testified credibly that the transfer had nothing to do with disinheriting Vega's son, who "wouldn't inherit from [her] anyway." *Id.* at 46:4-8.

### 5.  Overseas Property

As discussed below, one of Vega's statements accused Graterol-Garrido of hiding assets and income in chalets in Egypt. Neither Graterol-Garrido nor Ikladious ever owned property in Egypt. *Id.* at 68:9-16.

**6.  The Think+Do Tank Foundation**

When Graterol-Garrido moved to Australia, she was invited to chair the board of directors of the Think+Do Tank Foundation.  *Id.* at 72:23-73:11, 76:23.  The Think+Do Tank Foundation has a bookstore for children that sells books in many languages, and thus has a mission similar to HOLA's.  *Id.* at 72:25-73:3.

## C.  Vega's Statements

On May 16, 2020, Vega made a post on her Facebook page that was directed to Graterol-Garrido and accused her of engaging in many wrongful acts:

- Graterol-Garrido "fraudulently conveyed [her] UWS apartment to disinherit" Vega's son;

- Graterol-Garrido "falsely accused [Vega] of misconduct in court then refused to appear to testify to support [her] own lies";

- Graterol-Garrido "spent years transferring assets and hiding investments to make sure [her] husband[']s child support payments are so low that [her] lifestyle is not impacted";

- Graterol-Garrido "paid off unethical lawyers to assert that registering the obligations as required by Australian and US laws is not necessary";

- Graterol-Garrido "fle[d] the country to hide and prevent a child from having memories with [her] daughters";

- Graterol-Garrido made "financial maneuvers [that] were so complex that they overwhelm[ed] lawyers";

- Graterol-Garrido "got [her] corrupt friends from HOLA NYC to witness [the] transfers of [] luxury oceanfront Florida investment properties[] for $10";

- Graterol-Garrido "incited violence, US federal felony non-support and abandonment of a little boy";

- Graterol-Garrido "concealed [her] tax evasive investments and the fortune of . . . investment expenses . . . from every court and the company in Australia and the chalets in Egypt"; and

- Graterol-Garrido "fled the country with the . . . concealed incomes and the condo [she] sold [herself] for $10."

Exh. 49 ¶ 13 ("Facebook Post"); Tr. at 299:15-300:6 (Vega acknowledging that the Facebook Post is authentic).[3]  Graterol-Garrido learned of the post from two mutual friends.  Tr. at 44:19-23. Vega testified that the Facebook Post "was up for 20 hours" only, *id.* at 204:5, and there is no evidence to the contrary.

Also on May 16, 2020, Vega sent the Think+Do Tank Foundation a series of Facebook direct messages with additional accusations against Graterol-Garrido:

- Graterol-Garrido "defraud[ed] [Vega's] son and the United States federal government";

- Graterol-Garrido's "New York nonprofit employed undocumented workers with low wages and no legal protections";

- Graterol-Garrido "commingled assets through Venmo to conceal her income from the court to deprive [Vega's] son of legal child support that has never been established while she and her husband fled the country";

---

[3] The Facebook Post included other similar accusations, such as that Graterol-Garrido's "lawyers . . . helped [her] get away with . . . selling the luxury condos owned by tax evasive shell companies [she] controlled to companies that did not even exist," Facebook Post, which Graterol-Garrido does not seek judgment on, *see* Pl. Proposals ¶¶ 9, 12.

- Graterol-Garrido "is corrupt, has evaded taxes for decades"; and

- Graterol-Garrido "fled New York and moved back to Australia because it is one of the only countries that does not imprison people for non-support and abandonment of children."

Exh. 49 ¶ 14 ("Facebook Messages"); Tr. at 299:15-300:6 (Vega acknowledging that the Facebook Messages are authentic). Vega further "urg[ed]" the Foundation to "keep clear accounts to ensure [that Graterol-Garrido's] misconduct in New York is not repeated in your organization in Australia." Facebook Messages.

Vega testified that she lacked a way to contact Graterol-Garrido, and that she sent the Facebook Messages to the Think+Do Tank Foundation "to get [Graterol-Garrido's] attention" as Vega believed that Graterol-Garrido was an "upstanding civil rights activist" who "had no idea that" the misconduct that Vega alleged "was going on." Tr. at 202:23-203:8; *see also id.* at 212:24-213:2 ("I did not believe that she was capable of [the conduct Vega alleged]. I thought that [the allegations] would lead [Graterol-Garrido] to . . . contact me."). Vega explained that she "did not post the most egregious things in a public forum" but "sent them to a contact that [she] believed had a long-term relationship with" Graterol-Garrido. *Id.* at 203:21-24. She thought that if Graterol-Garrido "had to clarify, she could easily disavow" the allegations and they would have no lasting influence. *Id.* at 203:24-204:4. Vega testified that she "did not believe anyone who read [her statements] would believe any of" them. *Id.* at 212:6-8. However, given the specific allegations made by Vega as to Graterol-Garrido's conduct, combined with her urging that the Think+Do Tank Foundation "keep clear accounts to ensure [that Graterol-Garrido's] misconduct" is not repeated at that organization, Facebook Messages, and having observed Vega's testimony

at trial, the Court does not find credible Vega's insistence that she did not think anyone would believe these statements.

Vega made a third statement on May 16, 2020, this one a post on Twitter.  In this Tweet, Vega contended that Graterol-Garrido "schemed [t]o disinherit and defraud a child," and used a "[f]raudulent transfer to evade paying legal child support."  Exh. 49 ¶ 15 ("Twitter Post"); Tr. at 299:15-300:6 (Vega acknowledging that the Twitter Post is authentic).  Vega admitted at trial that she believed that the Twitter Post was false, and that only Ikladious was responsible for the alleged misconduct.  Tr. at 239:12-15, 240:12-242:17.  According to Vega, the Twitter Post "was taken down by" Twitter "almost immediately," within a "few hours."  Id. at 205:9-16.  While there is no evidence indicating that this post was up for longer than that, Vega did initially appeal Twitter's decision to take down the post.  Id. at 238:18-21

Overall, Vega testified that she has posted "thousands of messages on Facebook about what has happened to [her]" and others she views as harmed by the child support system.  Id. at 198:5-10.  Since May 16, 2020, Vega has continued to post messages on social media accusing Graterol-Garrido of similar misconduct.  Id. at 230:8-231:1.  For example, on October 15, 2020, after this lawsuit was filed, Vega wrote in a Facebook post that Graterol-Garrido and Ikladious "structured transactions to evade reporting requirements."  Id. at 231:14-232:15; Exh. 85 ("10/15/20 Facebook Post").[4]  Vega has made similar allegations that do not name Graterol-Garrido, but use thinly disguised depictions of her.  See Tr. at 235:1-239:17; Exhs. 86, 87.

---

[4] Vega also suggested in this Facebook post that the failure of Ikladious's lawyer, Karmel, to sue Vega for defamation implied that Vega's statements were true: "[Karmel] has not sued me for defamation because the truth is not defamation."  10/15/20 Facebook Post; see Tr. at 233:23-234:12 (Vega acknowledging the statement).

**D. The Impact of Vega's Statements**

When the Think+Do Tank Foundation received the May 16, 2020 Facebook Messages from Vega, the chairman of its board and its CEO requested a meeting with Graterol-Garrido.  Tr. at 75:9-16.  The Foundation then launched an internal investigation.  *Id.* at 73:12-23.  Graterol-Garrido was required to provide references and records, including sensitive information about the decaying state of her marriage.  *Id.*  The Think+Do Tank Foundation called Graterol-Garrido's lawyer, accountant, and friends, as well as HOLA, and ultimately determined that the allegations were unfounded.  *Id.* at 76:11-15.  While the Think+Do Tank Foundation continued to offer Graterol-Garrido a board position, Graterol-Garrido did not become chairperson.  *Id.* at 76:22-77:3.  Graterol-Garrido and the Foundation agreed that "it wasn't worth it" for her to become chairperson because of the potential impact of Vega's statements on future grants.  *Id.*  Graterol-Garrido continues to serve on the board of the Think+Do Tank Foundation as well as on boards of other nonprofit organizations.  *Id.* at 77:12-24.

Because of what transpired with the Think+Do Tank Foundation, Graterol-Garrido now proactively discloses her disputes with Vega when she discusses joining nonprofit organizations.  *Id.* at 73:24-74:7.  She also no longer uses social media and fears "cancel culture" if others discover the allegations.  *Id.* at 78:6-22.  Graterol-Garrido explained at trial that Vega's allegations have hurt her "reputation as an international expert" that she has "built . . . over the years," which is especially damaging in the nonprofit sector, in which employment depends on "relationship[s] and reputation."  *Id.* at 74:8-23.  She is now less willing to apply for new positions, and particularly roles in the government, despite her continuing success in the nonprofit sector.  *Id.* at 77:12-79:12.  Graterol-Garrido believes that a federal judgment confirming the falsity of Vega's allegations

would help resolve issues with professional contacts going forward, including with potential employers and clients. *Id.* at 81:23-82:15.

### III.    Conclusions of Law

**A. Legal Standards**

A federal court sitting in diversity applies the choice-of-law rules of the state in which it resides. *See Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003). Graterol-Garrido cites New York law in this case, *see* Pl. Proposals at 12-14, and Vega does not contest that application, *see generally* Deft. Proposals. The Court accordingly applies that law. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" (alteration in original) (quoting *Tehran-Berkeley Civ. & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989))).

"New York requires a libel plaintiff to prove five elements: (1) a written defamatory statement of fact regarding the plaintiff; (2) published to a third party by the defendant; (3) defendant's fault, varying in degree depending on whether plaintiff is a private or public party; (4) falsity of the defamatory statement; and (5) injury to plaintiff." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001); *see also Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). With certain exceptions, "statements that do not purport to convey *facts* about the plaintiff, but rather express certain kinds of *opinions* of the speaker, do not constitute defamation" under New York law. *Elias v. Rolling Stone LLC*, 872 F.3d 97, 110 (2d Cir. 2017). Accordingly, "[i]n discerning whether a statement is actionable under New York law, the Court considers a non-exclusive list of factors that includes: (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true

15

or false; and (3) whether either the full context of the communication . . . or the broader social context . . . are such as to signal . . . that what is being read or heard is likely to be opinion." *Id.* In other words, "New York courts look to the immediate context and the broader social context of the statement[s] and evaluate the impact that the statements would have on a reasonable reader." *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (citations omitted). "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact." *Id.*

The parties agree that Graterol-Garrido is a private figure and that the statements she contests were not on matters of public concern. *See* Pl. Proposals ¶¶ 20-22; Deft. Proposals at 1-2, 5-6. The Court agrees as well.[5] "In cases brought by private figure plaintiffs involving statements not related to a matter of legitimate public concern, a plaintiff need plead only that the defendant was negligent in making the statements." *Moraes v. White*, --- F. Supp. 3d ---, No. 21 Civ. 4743 (PAE), 2021 WL 5450604, at *13 (S.D.N.Y. Nov. 22, 2021) (citing *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000)); *see also Goldman v. Reddington*, 417 F. Supp. 3d 163, 173 (E.D.N.Y. 2019); *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 287 (S.D.N.Y. 2016).[6]

---

[5] Public figures are classified as such based on the "notoriety of their achievements or the vigor and success with which they seek the public's attention." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). A public figure suing for defamation must show that an allegedly defamatory statement was made "with knowledge of its falsity or with reckless disregard for the truth," commonly known as actual malice. *Id.* Speech on a matter of public concern "is related to a matter of political, social, or other concern to the community or . . . the subject of legitimate news interest," such that it is "of general interest and of value and concern to the public." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 129 (2d Cir. 2013) (cleaned up). Defamation liability for speech on matters of public concern also requires actual malice. *See id.*

[6] Graterol-Garrido argues that the standard of fault for private plaintiffs suing non-media defendants on matters not of public concern is strict liability, *see* Pl. Proposals ¶ 21, but fails to cite cases on point. Some New York case law is to the contrary. *See Frechtman v. Gutterman*, 979 N.Y.S.2d 58, 61 (App. Div. 2014) (quoting *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5

The "[p]laintiff's compensable injury is presumed if the defamatory statement falls within a category of libel *per se*." *Meloff*, 240 F.3d at 145. "A written statement that charges a person with the commission of a crime or tends to disparage a person in the way of his office[,] profession[,] or trade is libel *per se*." *Id.* (quotations omitted); *see also Zherka v. Amicone*, 634 F.3d 642, 645 & n.6 (2d Cir. 2011).

## B.  Liability

The first two elements of libel are apparently uncontested and, regardless, were plainly proven at trial: Vega's statements were written and they were published to third parties.  Vega argues, though, that her statements were true, statements of opinion, or in self-defense to wrongful conduct by others.  *See* Deft. Proposals ¶¶ 4-5, 8, 24-27.  The Court addresses these questions first with respect to Vega's allegations of financial misconduct by Graterol-Garrido, and then with respect to Vega's allegations of personal or other legal misconduct.

### 1.  Allegations of Financial Misconduct

Vega made a variety of accusations of financial misconduct against Graterol-Garrido.  First, Vega said that Graterol-Garrido conducted fraudulent transfers of property to decrease Ikladious's child support payments.  *See* Facebook Post (stating that Graterol-Garrido "fraudulently conveyed [her] UWS apartment to disinherit" Vega's son, and "spent years transferring assets and hiding investments" to do the same); Twitter Post (stating that Graterol-Garrido used a "[f]raudulent transfer to evade paying legal child support").  She similarly accused Graterol-Garrido of

---

(App. Div. 1999)).  Moreover, a strict liability standard would raise substantial constitutional questions.  And "[t]he Supreme Court never has considered what should be the standard of liability . . . when it is a private figure as plaintiff and the matter is not of a public concern."  Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1149 (6th ed. 2019); *see also Powell v. Jones-Soderman*, 849 F. App'x 274, 278 (2d Cir. 2021) (stating that "the constitutional minimum [is] negligence").  In any event, because the Court finds that Vega acted with negligence, the Court need not reach whether a strict liability standard applies.

"defraud[ing] [Vega's] son and the United States federal government."  Facebook Messages.
Relatedly, Vega wrote that Graterol-Garrido "transfer[red] . . . luxury oceanfront Florida
property[] for $10," which was witnessed by Graterol-Garrido's "corrupt friends from HOLA
NYC," and that Graterol-Garrido subsequently "fled the country" with the proceeds.  Facebook
Post.  Vega also accused Graterol-Garrido of hiding assets and income from legal authorities.  *See*
Facebook Post (Graterol-Garrido "hid[] investments" to minimize Ikladious's child support
obligations and "concealed [her] tax evasive investments . . . from every court"); Facebook
Messages (Graterol-Garrido "evaded taxes for decades" and "moved [] to Australia because it . . .
does not imprison people for non-support"); *see also* 10/15/20 Facebook Post (Graterol-Garrido
"structured transactions to avoid reporting requirements").  The methods that Graterol-Garrido
allegedly used to accomplish this deception were boutique.  They included "chalets in Egypt,"
Facebook Post, and "commingled assets through Venmo," Facebook Messages.

Vega first argues that her statements were true.  With respect to the accusations of a
fraudulent transfer, Vega testified that the transfer of the Upper West Side condominium used a
"false grantor,"[7] and that "any person who is in a dispute of child support . . . would believe that it
[was] a fraudulent conveyance."  Tr. at 199:23-201:11.  She also maintained at trial that the
condominium deed was "forged" or "fraudulent because it has a grantor that does not exist"—
meaning that the deed was from a nonexistent LLC—and "missing notary pages."  *Id.* at 259:14-
20, 260:15.  Vega also stated that she believed that deeds reflected the transfer of real estate for
ten dollars, and that the transfer violated federal structuring laws.  *Id.* at 232:2-233:18.  She further

---

[7] Presumably, Vega was referring to the discrepancy between documents that show that
Graterol-Garrido and Ikladious purchased the condominium in their individual capacities, but that
the condominium was later transferred from an LLC, not from Graterol-Garrido and Ikladious, to
Graterol-Garrido.  Tr. at 95:16-23, 96:23-97:11, 108:17-109:11.

explained that she viewed Graterol-Garrido's use of a personal bank account to pay for HOLA expenses as "corruption" that "deceive[d] the Internal Revenue Service." *Id.* at 221:13-18. And finally, Vega said that her allegations relating to an alleged Egyptian chalet were the result of a Google search that showed a "Peter Ikladious" as owning such a house in Egypt. *Id.* at 277:13-278:16.

Graterol-Garrido credibly and convincingly denied all of these allegations. While paperwork mistakes may have been made in the transfer of the Upper West Side condominium, Graterol-Garrido and Ikladious acted on the advice of counsel and there is absolutely no evidence to suggest that they transferred the apartment in an attempt at fraud. *Id.* at 96:23-97:11, 108:17-109:11. Likewise, while Graterol-Garrido used deeds listing purchase prices of ten dollars and other good and valuable consideration in Florida, she did so on the advice of professionals and in line with standard practices in real estate transactions. *Id.* at 53:24-54:3, 58:25-59:7. She also complied with applicable tax laws, again by engaging professionals. *Id.* at 125:17-19, 127:11-13. While Graterol-Garrido made some payments related to HOLA using Venmo, the payments came only from her personal funds, not funds commingled with HOLA's funds. *Id.* at 80:22-81:11, 149:16-22. Finally, neither Graterol-Garrido nor Ikladious ever owned property in Egypt. *Id.* at 68:9-16.

Vega's own testimony in fact repeatedly undermined the truthfulness of the statements she made about Graterol-Garrido on May 16, 2020. With respect to the allegations about the ten-dollar real estate transaction, Vega admitted that, upon investigation, she discovered that documents reflecting transfers of real property for nominal sums are routine. *Id.* at 272:14-273:7. As to the transfer of the Upper West Side condominium, which Vega expressly accused Graterol-Garrido of fraudulently conveying, Vega testified that she "believed that [Graterol-Garrido] did not know that

her husband had conveyed the property to her name" or "forged [the] deed." *Id.* at 203:7-12.
Likewise, Vega admitted that she knew that structuring is a federal banking crime "related to . . .
cash deposits into bank accounts," not real estate transactions. *Id.* at 273:24-275:5. Moreover,
Vega conceded that she knew that her allegation that Graterol-Garrido "spent years transferring
and hiding investments" to reduce her husband's child support obligations, Facebook Post, was
false; in fact, she knew that Graterol-Garrido could not have, as Graterol-Garrido did not know of
the child until July 2018 or later. Tr. at 270:13-23. Vega also suggested that she realized the
accusations in the Facebook Messages were false, explaining that those statements were intended
to get Graterol-Garrido's attention. *Id.* at 202:23-203:12. In fact, Vega acknowledged at trial that
she did not think that Graterol-Garrido was personally involved in any fraud, as Vega did not
believe that Graterol-Garrido was capable of such misconduct. *Id.* at 202:23-203:12, 212:24-25.
As Vega testified:

> My knowledge of Ms. Graterol-Garrido, prior to this, was that she was an
> upstanding civil rights activist who would never have part in hurting a child, and I
> believed that she had no idea that this was going on. I believed she did not know
> that her husband had conveyed the property to her name. I believed that the forged
> deed was forged by her husband appearing alone with documents [that] alleged he
> was a party to an LLC, allowing him to sign as a seller, as an individual without his
> wife having to appear.

*Id.* at 203:4-12. Thus, the evidence convincingly shows that these statements by Vega about
Graterol-Garrido's commission of financial misconduct were false, and in fact that Vega knew that
to be the case.

The same evidence also shows that Vega acted, at a minimum, with negligence when she
made these allegations. Vega investigated Graterol-Garrido's finances, but consistently drew
extravagant inferences from the documents she uncovered and made little or no effort to confirm
that those inferences were correct or even reasonable. For example, she discovered that "$10 and

other good and valuable consideration" is "standard language" by looking it up on the internet only after she publicly accused Graterol-Garrido of structuring based on the language. *Id.* at 272:15-273:1. Similarly, Vega's basis for alleging that Graterol-Garrido hid an Egyptian chalet from the courts was the result of a Google search for the name "Peter Ikladious," without confirming that it was him. *Id.* at 277:13-278:16. A reasonable person would perform at least cursory diligence before launching such serious allegations on the basis of a single Internet search.[8] Vega was even in a better position than most to vet allegations of illegality, given her prior work in the legal profession and her acquaintances with multiple attorneys. *Id.* at 285:7-12, 286:2-4.

Vega argues next that her writings were statements of opinion, not of fact. Deft. Proposals ¶¶ 24-27. Certain statements could arguably be considered statements of opinion. Specifically, Vega wrote that Graterol-Garrido was "corrupt," Facebook Messages, and made "financial maneuvers [that] were so complex that they overwhelm[ed] lawyers," Facebook Post. To be actionable under New York law, a statement must have a "precise" or "readily understood" meaning, and must not appear to reasonable onlookers as mere opinion. *Elias*, 872 F.3d at 110; *see also Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014) (explaining that "sucker, fool, frontman, industrial waste, pilot of the ship of doom, and crooks or morons" were "insult[s]" and "not actionable opinion" (cleaned up)). The Court need not resolve whether these two statements were in fact opinion, and therefore not actionable as defamation, given its findings with regard to other allegations of financial misconduct. The Court therefore does not rely on these two statements in reaching its findings as to liability or assessment of damages.

---

[8] As Graterol-Garrido testified at trial, "Ikladious is a quite common name in Egypt." Tr. at 68:16.

However, the remainder of Vega's allegations of financial misconduct clearly have precise meanings, can be proven true or false, and would generally be viewed as statements of fact in the context in which they were delivered.  Fraudulent conveyances, tax evasion, concealing assets, and structuring all refer to specific types of conduct that Graterol-Garrido either engaged in or did not, and reasonable observers would understand Vega's accusations as referring to such specific conduct.  *See Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 721-22 (S.D.N.Y. 2014) (collecting cases holding allegations of criminal activity to be actionable statements of fact). These statements did not include "customs or signals to readers that something is opinion," *Chau*, 771 F.3d at 129, or "qualifying language," *Small Bus. Bodyguard, Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 313 (S.D.N.Y. 2017).[9]  Nor did they "fully and accurately set forth" "the facts on which they [were] based" and make it "clear to the reasonable reader . . . that the accusation [was] merely a personal surmise based upon those facts."  *Moraes*, 2021 WL 5450604, at *11.  Instead, Vega made explicit accusations of criminal activity, with the "clear implication"

---

[9] While the Facebook Post is rambling and emotional, which would likely lead reasonable observers to grant it less credence than a more restrained expression, *see, e.g.*, *Hayashi v. Ozawa*, No. 17 Civ. 2558 (AJN), 2019 WL 1409389, at *5 (S.D.N.Y. Mar. 28, 2019) (collecting cases), the factual allegations contained in it were specific, definitive, and unqualified.  This case is thus distinct from those in which online posts have been held to be non-actionable.  *Compare id.* at *3-5 (holding online rant to be non-actionable when it was unclear, used unusual formatting, explicitly indicated the influence of alcohol, and used strings of rhetorical questions); *Brahms v. Carver*, 33 F. Supp. 3d 192, 200 (E.D.N.Y. 2014) (holding statements in an online argument to be non-actionable when "[n]o reasonable reader could have inferred from the posted conversation that [the defendant] knew additional, undisclosed facts about [the plaintiff] that supported his post"); *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 415 (App. Div. 2011) (holding that an email "replete with rhetorical questions" was, as a whole, only "an exercise in rhetoric," "call[ing] to the reader's attention the writer's" political beliefs); *Versaci v. Richie*, 815 N.Y.S.2d 350, 351-52. (App. Div. 2006) (explaining that calling someone a "so called attorney" on an online message board would be construed as factual by "no reasonable reader"), *with Moraes*, 2021 WL 5450604, at *12 (holding that a reasonable observer would not view argumentative online posts as mere "fact-free Internet bloviating" because they alleged specific misconduct and implied an undisclosed factual basis for those allegations from the defendant's personal knowledge).

being "that she knew undisclosed facts supporting her contention[s]" that Graterol-Garrido in fact engaged in improper conduct. *Id.* Indeed, in the Facebook Post, Vega expressly represented that she had "proof" of Graterol-Garrido's wrongdoing. Facebook Post. In light of these allegations, it is not surprising that the chairman and CEO of the Think+Do Tank Foundation requested a meeting with Graterol-Garrido or that the Foundation launched an investigation. *See* Tr. at 73:12-23.

Vega finally asserts "self-defense." *See* Deft. Proposals ¶¶ 91-94. The contours of her purported defense are unclear; Vega claims that her statements merely retaliated for crimes by Ikladious's attorney, Karmel, and others who engaged in racketeering, extortion, larceny, obstruction of justice, witness tampering, mail and wire fraud, and other crimes. *Id.* Her articulation of this defense, if anything, would seem more likely to source a libel case than to defend against one. But more importantly, this purported grounds for self-defense in no way saves Vega from liability here.

### 2. Allegations of Personal and Legal Misconduct

Some of Vega's other allegations against Graterol-Garrido concerned personal and other legal matters. First, Vega accused Graterol-Garrido of misconduct in family law proceedings: Graterol-Garrido supposedly "falsely accused [Vega] of misconduct in court then refused to appear to testify to support [her] own lies" and "paid off unethical lawyers to assert that registering the obligations as required by Australian and US laws is not necessary." Facebook Post. Second, Vega alleged that Graterol-Garrido intended to harm Vega's child. Vega said that Graterol-Garrido "fle[d] the country to hide and prevent a child from having memories with [Graterol-Garrido's] daughters" and "incited violence, US federal felony nonsupport and abandonment of a little boy." *Id.*; *see also* Twitter Post (alleging that Graterol-Garrido "schemed [t]o disinherit and

defraud a child"). And finally, Graterol-Garrido told the Think+Do Tank Foundation that Vega's "New York nonprofit employed undocumented workers with low wages and no legal protections." Facebook Messages.

Again, Graterol-Garrido credibly testified that none of these allegations were true. Graterol-Garrido has never appeared in family court, let alone presented false evidence in family court proceedings concerning Vega. Tr. at 47:22-48:1, 268:8-19. Graterol-Garrido did not retain Ikladious's lawyer, Karmel, a target of Vega's ire. *Id.* at 52:4-53:2, 278:17-24. Graterol-Garrido did not move to Australia to avoid her children meeting Vega's child, as her family was already planning to move before she learned that Ikladious had fathered a child with Vega. *Id.* at 48:17-49:20. Graterol-Garrido credibly maintained at trial that she has never incited violence or been involved in other criminal activity, *id.* at 67:8-23, and no evidence suggests otherwise. And similarly Graterol-Garrido credibly testified that her nonprofit organization, HOLA, complied with all applicable labor and employment laws, *id.* at 64:21-23, 79:25-80:21, and again there is no evidence to the contrary.

Here too, Vega's attempts at trial to rebut this evidence actually undermined the truth of her statements, and in fact made clear that Vega knew that some of her statements about Graterol-Garrido were false. Vega acknowledged that Graterol-Garrido had never testified against her in family court. *Id.* at 268:4-19. Though Vega accused Graterol-Garrido of retaining an unethical lawyer, *i.e.*, Karmel, Vega also understood that Karmel did not work for Graterol-Garrido. *Id.* at 202:24-25.[10] Vega agreed that "federal felony nonsupport" is limited to situations in which there is a failure to comply with "legally ordered support," and that Ikladious has, in fact, been paying

---

[10] As noted, Ikladious retained Karmel to represent him in the family court proceedings. Tr. at 52:16-19.

child support.  *Id.* at 275:6-277:6.  Vega even admitted that she did not believe that Graterol-Garrido actually "fled the country to avoid having her daughters meet [Vega's] son" at the time that she hurled that accusation in the Facebook Post.  *Id.* at 271:23-272:13.  She also explained that, in her view, Graterol-Garrido had incited violence only metaphorically, by refusing to countenance visits between their children.  *Id.* at 213:24-214:11.[11]  And Vega's stated basis for her opinion that Graterol-Garrido aided Ikladious's evasion of child support was simply that Graterol-Garrido believed that Ikladious was "paying child support consistent with the law."  *Id.* at 182:18-22; *see also id.* at 183:4-8, 187:18-21, 192:20-23.

Vega's statements alleging personal misconduct by Graterol-Garrido were also, at a minimum, negligent.  As just discussed, the statements often were at odds with the facts that Vega knew, such as that Graterol-Garrido never testified in family court, did not employ Karmel, did not exit the United States to avoid Vega's child, and believed Ikladious was paying child support.  Vega did not even offer any testimony or evidence to support her accusation in the Facebook Messages that Graterol-Garrido failed to pay the minimum wage at HOLA.  *See* Facebook Messages.  And Vega strongly implied that she did not believe what she wrote in her communications to the Think+Do Tank Foundation, explaining that the Facebook Messages were "intended to get [Graterol-Garrido's] attention."  Tr. at 203:2-8.

Contrary to Vega's argument, the bulk of her statements alleging personal misconduct by Graterol-Garrido were not mere opinion and hyperbole, with one possible exception: Vega's accusation that Graterol-Garrido incited violence.  *See* Facebook Post.  Incitement has a specific legal meaning, but it may also be used metaphorically, as Vega sought to justify at trial.  *See* Tr.

---

[11]  Similarly, Vega testified that she "believed" that an email from Graterol-Garrido requesting that Vega not contact Graterol-Garrido's daughters "constitute[d] extortion" and "coercion."  Tr. at 199:8-18.

at 213:24-214:11.  While violence suggests more specific conduct, the post did not elaborate on the type of violence Graterol-Garrido supposedly incited.  But here too, the Court need not reach whether a reasonable reader would view Vega's accusation that Graterol-Garrido incited violence as conveying a statement of fact, *see Elias*, 872 F.3d at 110, given the many other libelous statements accusing Graterol-Garrido of specific acts of personal misconduct.  The Court also does not rely on this statement in reaching its liability findings or in arriving at damages.

With respect to the other statements, Vega made accusations of specific types of personal and legal misconduct.  For example, she testified that by accusing Graterol-Garrido of "incit[ing] . . . US federal felony non-support," Facebook Post, she was "not speaking casually," but "talking about a specific statute," "18 U.S.C. [§] 228."  Tr. at 275:11-14.  Her allegations of those specific instances of conduct were either true or false—for instance, either Graterol-Garrido falsely accused Vega of misconduct in court, retained a lawyer to argue that Ikladious did not need to register his child support obligations, and left the country to separate the women's children, or she did not.[12] A reasonable observer would read the posts in line with Vega's obvious intention, to convey disparaging facts about Graterol-Garrido.  Vega therefore cannot avail herself to an opinion defense.  *See Elias*, 872 F.3d at 110.[13]

---

[12] However, Vega's characterization of Graterol-Garrido's counsel, Karmel, as "unethical," Facebook Post, is indeed opinion.  *See Small Bus. Bodyguard, Inc.*, 230 F. Supp. 3d at 315-16.  The larger problem with this statement, though, is that Graterol-Garrido did not actually retain the lawyer in question at all, and that lawyer did not represent Graterol-Garrido.

[13] Any additional "self-defense" claim asserted by Vega, Deft. Proposals ¶¶ 91-94, fails for the reasons addressed above.

### 3.  Summary of Liability Findings

In sum, the Court finds, by a preponderance of the evidence, in favor of Graterol-Garrido as to all three causes of action.  With respect to the first cause of action, the Court finds that the following statements contained in the Facebook Post were defamatory:

- Graterol-Garrido "fraudulently conveyed [her] UWS apartment to disinherit" Vega's son;

- Graterol-Garrido "falsely accused [Vega] of misconduct in court then refused to appear to testify to support [her] own lies";

- Graterol-Garrido "spent years transferring assets and hiding investments to make sure [her] husband[']s child support payments are so low that [her] lifestyle is not impacted";

- Graterol-Garrido "paid off unethical lawyers to assert that registering the obligations as required by Australian and US laws is not necessary";

- Graterol-Garrido "fle[d] the country to hide and prevent a child from having memories with [her] daughters";

- Graterol-Garrido "got [her] corrupt friends from HOLA NYC to witness [the] transfers of [] luxury oceanfront Florida investment properties[] for $10";

- "Graterol-Garrido "incited . . .  US federal felony non-support and abandonment of a little boy";

- Graterol-Garrido "concealed [her] tax evasive investments and the fortune of . . . investment expenses . . .  from every court and the company in Australia and the chalets in Egypt"; and

- Graterol-Garrido "fled the country with the . . . concealed incomes and the condo [she] sold [herself] for $10."

Facebook Post.  With respect to the second cause of action, the Court finds that the following statements contained in the Facebook Messages were defamatory:

- Graterol-Garrido "defraud[ed] [Vega's] son and the United States federal government";

- Graterol-Garrido's "New York nonprofit employed undocumented workers with low wages and no legal protections";

- Graterol-Garrido "commingled assets through Venmo to conceal her income from the court to deprive [Vega's] son of legal child support that has never been established while she and her husband fled the country";

- Graterol-Garrido "has evaded taxes for decades"; and

- Graterol-Garrido "fled New York and moved back to Australia because it is one of the only countries that does not imprison people for non-support and abandonment of children."

Facebook Messages.  And lastly, with respect to the third cause of action, the Court finds that the following statement contained in the Twitter Post was defamatory: Graterol-Garrido "schemed [t]o disinherit and defraud a child," by using a "[f]raudulent transfer to evade paying legal child support."  Twitter Post.

## C.  Damages

Graterol-Garrido requests presumed damages under the doctrine of libel *per se*.  Pl. Proposals ¶ 31.  As mentioned, an allegation "that charges a person with the commission of a crime or tends to disparage a person in the way of his office[,] profession[,] or trade is libel *per se*."

*Meloff*, 240 F.3d at 145 (quotations omitted).  "To be actionable as words that tend to injure another in his or her profession, the challenged statement must be more than a general reflection upon plaintiff's character or qualities," and instead "must reflect on her performance or be incompatible with the proper conduct of her business."  *Stern v. Cosby*, 645 F. Supp. 2d 258, 290 (S.D.N.Y. 2009) (cleaned up).

As discussed, Vega's libelous allegations included that Graterol-Garrido engaged in fraudulent transfers, fraud on the courts, tax evasion, encouragement of non-support of a child, and unlawful labor and employment practices.  *See generally* Facebook Post; Facebook Messages; Twitter Post.  Such allegations "tend[] to disparage [Graterol-Garrido] . . . [by] way of [her] office[,] profession[,] or trade."  *Meloff*, 240 F.3d at 145 (quotations omitted).[14]  Graterol-Garrido's profession is in nonprofit administration.  Nonprofit organizations would not be inclined to bring in a board member, manager, or executive who engaged in white-collar crime and deceit.  *See Shah v. Levy*, No. 13 Civ. 2975 (LGS), 2016 WL 6459805, at *5 (S.D.N.Y. Oct. 31, 2016) (explaining that libel *per se* may include accusations that a finance worker engaged in financial misconduct); *Neuman v. Glob. Sec. Sols., Inc.*, No. 21 Civ. 1670 (DLC), 2022 WL 1782588, at *2 (S.D.N.Y. Jun. 1, 2022) (same, for accusation that a businessman engaged in fraud).  And again, some of Vega's libelous messages were sent to Graterol-Garrido's professional contact, the Think+Do Tank Foundation, and plainly sought to harm Graterol-Garrido's relationship with that entity.  *See* Facebook Messages.  And those messages did in fact have that effect as, despite an

---

[14] Many of the allegations also accused Graterol-Garrido of crimes.  The libel *per se* doctrine is only implicated for an accusation of criminal activity when the accusation is of a "serious" crime, meaning one "punishable by imprisonment" or "regarded by public opinion as involving moral turpitude."  *Brandenburg v. Greek Orthodox Archdiocese of N. Am.*, No. 20 Civ. 3809 (JMF), 2021 WL 2206486, at *9 (S.D.N.Y. Jun. 1, 2021).  Because Vega's statements plainly disparaged Graterol-Garrido's professional fitness, the Court need not reach whether they additionally implicated such serious crimes.

internal investigation that cleared Graterol-Garrido of any wrongdoing, Graterol-Garrido and the Think+Do Tank Foundation decided it would be in the best interest of the Foundation for Graterol-Garrido not to chair its board.

"Presumed damages are justified on the grounds that those forms of defamation that are actionable *per se* are virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove." *Robertson v. Doe*, No. 05 Civ. 7046 (LAP), 2010 WL 11527317, at *2 (S.D.N.Y. May 11, 2010) (quotations omitted). Likewise, "mental and emotional distress" are difficult to prove. *Id.* However, the "entitlement to general damages does not imply a right to substantial damages," which requires "a finding of substantial injury." *Id.* at 3 (awarding nominal damages of $1,000 because the plaintiff "failed to offer evidence of actual harm").

The Court thus considers the harm to Graterol-Garrido when assessing damages. As just noted, there was actual harm here. The most evident professional harm to Graterol-Garrido came from Vega's messages to the Think+Do Tank Foundation. Upon receiving the messages, the Foundation initiated an internal investigation that required Graterol-Garrido to turn over sensitive documents and involved interviews of Graterol-Garrido's friends and professional colleagues. Tr. at 73:12-23, 76:13-15. While going through a very difficult period, Graterol-Garrido had to provide the Foundation with deeply personal information about her crumbling marriage, as well as references to vouch for her character. *Id.* at 73:12-23. Graterol-Garrido still received a seat on the board of directors, but agreed with the Foundation that she should not serve as its chairperson out of concerns that Vega's allegations would negatively impact the Foundation's fundraising efforts. *Id.* at 76:22-77:3. And again, the failure of Vega's defamation to further impede Graterol-Garrido's relationship with the Foundation was not for lack of effort on Vega's part. Vega explicitly "urged" the Foundation "to keep clear accounts to ensure [Graterol-Garrido's] financial

misconduct . . . is not repeated." Facebook Messages. Further harm suffered by Graterol-Garrido has come from her resulting decision to affirmatively disclose Vega's online allegations when applying to prospective positions. *Id.* at 73:24-74:7. And Graterol-Garrido testified credibly that Vega's allegations has led her to cease using social media and impacted her willingness to pursue certain professional opportunities. *Id.* at 77:12-79:12.

The Court also has considered the harm caused while mindful of the limited circulation of Vega's social media postings. Vega testified that both the Facebook Post and the Twitter Post were quickly removed by the social media services, and there is no evidence otherwise. *Id.* at 204:5, 205:9-16. The short period of time when these defamatory messages were viewable mitigates the damage they caused. Graterol-Garrido did not offer evidence as to the number of Vega's Facebook "friends" or Twitter "followers," and there is no reason to believe that her personal social media pages had particularly large viewerships. At the same time, Vega has made many online allegations about Graterol-Garrido beyond the Facebook Post and the Twitter Post since the start of this litigation. *Id.* at 230:8-231:1, 231:17-232:15. She has also, at least to an extent, attempted to prevent her libelous posting on Twitter from being removed by company. *Id.* at 238:2-239:2. Vega also implied that she has nothing to lose, given her current financial situation, *id.* at 250:16-251:9, which further warrants anxiety on Graterol-Garrido's part that Vega's defamatory conduct will continue going forward. Indeed, as noted above, Vega continued to make social media postings attacking Graterol-Garrido even after Graterol-Garrido commenced this litigation. *See* Tr. 231:5-232:15, 234:22-239:21; Exhs. 85, 86, 87.

Considering all of these factors, the Court awards Graterol-Garrido $5,000 in damages for her injuries. The Court does not find that a further award of punitive damages is appropriate.

### III. Conclusion

For the foregoing reasons, the Court enters judgment on liability for Graterol-Garrido on all claims, and awards her monetary damages in the amount of $5,000.  Graterol-Garrido shall submit a status letter as to whether she continues to seek injunctive relief, and the grounds for such additional relief, by July 25, 2022.[15]

SO ORDERED.

Dated: July 11, 2022
New York, New York

_____
JOHN P. CRONAN
United States District Judge

---

[15] If Graterol-Garrido still intends to seek a permanent injunction, *see* Pl. Proposals at 20 n.4, her submission shall explain why such a request would be appropriate given the "heavy presumption against prior restraints," the tradition that "equity will not enjoin a libel," and "century" of Second Circuit precedent that "injunctions should not ordinarily issue in defamation cases." *Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001); *see also DAddio v. Kerik*, No. 15 Civ. 5497 (JGK) (SDA), 2019 WL 4862988, at *2 (S.D.N.Y. Sept. 6, 2019) (rejecting a request to issue an injunction against libel even when the defendant defaulted).